# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| QUENTIN RHODES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  1:20CV42 |
| | ) |
| ANJANETTE TALTON, et al., | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This matter is before the Court upon Defendants William Bullard, Dean Locklear, and Katy Poole's (collectively "Defendants") Motion for Summary Judgment. (Docket Entry 44.) Plaintiff Quentin Rhodes filed a response in opposition to Defendants' motion. (Docket Entry 49; *see also* Docket Entry 50.) Defendants then filed a reply (Docket Entry 51), and Plaintiff thereafter filed a sur-reply (Docket Entry 52). The matter is now ripe for disposition. For the reasons that follow, the undersigned will recommend that Defendants' Motion for Summary Judgment be granted.

### I. BACKGROUND

Plaintiff, a *pro se* prisoner, filed this action alleging Eighth Amendment violations that occurred while he was housed at Scotland Correctional Institution (hereinafter "Scotland") on May 25, 2019. (*See* Compl., Docket Entry 2 at 3-8.)[1] More specifically, he alleges that he

---

[1] Unless otherwise noted, all citations in this recommendation to documents filed with the Court refer to the page numbers located at the bottom right-hand corner of the documents as they appear on CM/ECF.

made Defendants Bullard, Locklear, and Poole, all supervisory officials at Scotland, aware by multiple means, that he was afraid for his safety at Scotland. (*Id.* at 5.) Plaintiff wrote letters, filed grievances, and had family members contact Scotland officials to reiterate Plaintiff's safety concerns pertaining to other inmates. (*Id.*)

After Defendants failed to take his safety concerns seriously or provide him with protection, Plaintiff alleges that on May 25, 2019, he was assaulted and stabbed by multiple inmates. (*Id.*) Plaintiff alleges that Defendant Anjanette Talton ("Officer Talton"), a prison official present on the day of the attack, opened the housing door in Plaintiff's unit and allowed an unsupervised inmate with a weapon (Mr. Little) to come into Plaintiff's housing area. (*Id.*) Plaintiff was subsequently attacked and stabbed multiple times by that inmate and others as a result. (*Id.*) Plaintiff alleges that all Defendants were aware of Plaintiff's safety concerns prior to the incident. (*Id.* at 5-6.)

As a result of the attack, Plaintiff had multiple stab wounds, a chipped tooth, and a sprained wrist and ankle with severe bruising. (*Id.* at 6.) Plaintiff asked Defendants Bullard and Poole to notify the local authorities regarding the attack, but they failed to "press the issue." (*Id.*) Even after the incident, Plaintiff was placed back in the regular population possibly subjecting him to more physical harm. (*Id.*)

On March 16, 2022, Defendants Bullard, Locklear, and Poole moved for summary judgment, arguing that there are no genuine issues of material fact which support Plaintiff's claim of an alleged violation of his constitutional rights. (Docket Entry 44.) Along with their brief in support of their motion, Defendants filed declarations on their behalf. (*See* Declaration of Katy Poole ("Poole Decl."), Docket Entry 45-2; Declaration of Dean Locklear ("Locklear

2

Case 1:20-cv-00042-LCB-JLW   Document 53   Filed 01/11/23   Page 2 of 17

Decl."), Docket Entry 45-3; Declaration of William Bullard ("Bullard Decl."), Docket Entry 45-4.) In addition, counsel for Defendants filed a declaration and attached multiples exhibits which are records maintained by the North Carolina Department of Public Safety ("NCDPS"). (*See* Declaration of Alex R. Williams ("Williams Decl.") and exhibits, Docket Entry 45-1.)

Included in the records is Plaintiff's December 2018 grievance in which he complains of safety concerns at Scotland. (*See* 2018 Grievance, Ex. D to Williams Decl., Docket Entry 45-1 at 14-22.) Plaintiff notes that he was previously subjected to an emergency transfer from Scotland in 2014 because there was an inmate and a corrections officer at Scotland related to the victim in Plaintiff's criminal matter. (*Id.* at 15.) Plaintiff stated that it was negligent for him to be housed back at Scotland and though he did not feel safe, he was not requesting protective custody. (*Id.* at 15, 19.)

At the step one response, Defendant Bullard acknowledged that Plaintiff had been previously moved in August 2014 but noted that "there [was] no evidence nor was central monitoring approved for [Plaintiff] not be housed at Scotland." (*Id.* at 21.) Plaintiff was informed that specific names needed to be provided for a thorough investigation to be conducted for him "not to be around any staff/offenders." (*Id.*) Defendant Bullard's disposition of Plaintiff's step one grievance was that "no further action [was] recommended at th[e] time." (*Id.*) While Plaintiff appealed the step one findings, Defendant Bullard avers that specific names were never submitted to him, nor did Plaintiff inform Defendant Bullard about any specific threats to his safety. (*Id.*; *see also* Bullard Decl. ¶¶ 4-5.) In addition, Defendant Bullard did not receive any phone calls from Plaintiff's family members regarding

3

his safety. (Bullard Decl. ¶ 6.) Defendant Bullard still attempted to determine the names of the individuals to whom Plaintiff was referring but was unable to do so. (*Id.* ¶ 4.)

Defendant Locklear then processed the step two response, agreeing with the step one findings and recommending no further action, and Plaintiff thereafter appealed the step two decision. (2018 Grievance, Williams Decl. at 22.) Defendant Locklear states that he also never received any specific names from Plaintiff, nor did Plaintiff inform him of any specific safety threats. (Locklear Decl. ¶¶ 4-5.) Defendant Locklear never received phone calls from Plaintiff's family members about safety concerns and never witnessed staff members nor inmates threaten Plaintiff. (*Id.* ¶¶ 6-7.) Step three of Plaintiff's grievance was then processed by the Grievance Examiner, who is not a party to this action, and was dismissed. (2018 Grievance, Williams Decl. at 14.) Defendant Poole was not one of the officers involved in processing Plaintiff's 2018 grievance. (*Id.* at 14-22; *see also* Poole Decl. ¶ 3.)

Defendants also provided the video footage of the May 25, 2019[2] incident in which Plaintiff was involved in a physical altercation with two to three fellow inmates at Scotland (*see* Ex. E to Williams Decl., Docket Entry 45-1 at 23), and the Incident Report and witness statements outlining the investigation that Scotland staff conducted after the altercation. (Incident Report, Ex. K to Williams Decl., Docket Entry 45-1 at 64-76; Witness Statements, Exs. L & M to Williams Decl., Docket Entry 45-1 at 77-78.) Defendants Locklear and Bullard were not physically present during the incident. (Locklear Decl. ¶ 9; Bullard Decl. ¶ 9.) According to Officer Talton's witness statement of the altercation, at approximately 5:05 p.m., she "observed two inmates walking around in circles with one appearing to have a knife-like

---

[2] This exhibit has been manually filed with the Court.

object in one hand," and she "immediately called a Code 4." (Witness Statements, Williams Decl. at 77.) The Incident Report reflects that several officers responded to the Code 4 and attempted to deescalate the physical altercation with verbal commands followed by the use of pepper spray and tasers. (Incident Report, Williams Decl. at 64-66.)[3] A correctional sergeant administered pepper spray to the facial areas of the inmates and deployed his taser on Plaintiff after he and the other inmates ignored verbal orders to stop fighting. (*Id.* at 64.) Plaintiff was hit in his lower back on the left side and fell to the floor. (*Id.*) After the correctional sergeant deployed his taser on another inmate, they briefly stopped fighting, then continued on. (*Id.*) Plaintiff was subsequently handcuffed and escorted to receiving. (*Id.* at 66.)

A confidential informant provided "intelligence" during the investigation of the incident, stating that the altercation was caused by "high ranking blood members" and that Plaintiff owed money to the bloods which he refused to pay. (*Id.* at 68-69.) The report further notes that all of the inmates involved, including Plaintiff, "were charged and found guilty of an A14 involvement with gang activity." (*Id.* at 70.) Plaintiff refused to make a statement regarding the altercation as part of the investigation. (Witness Statements, Williams Decl. at 78.)

The Incident Report further states that "[o]nly the amount of force necessary to reach the correctional objective was used[,]" that "[a]ll policies and procedures in place were followed," and that local law enforcement were notified of the incident, but "they refused to report to the facility" because the inmates involved were "reluctant to write a statement." (Incident Report, Williams Decl. at 69-70, 73.) Defendants also attached the Shift Narrative

---

[3] A baton was used on one inmate. (Incident Report, Williams Decl. at 66.)

Report which reflects that the Code 4 was called during chow time (dinner). (*See* Narrative Report, Ex. N to Williams Decl., Docket Entry 45-1 at 83-84.) Defendants Bullard and Locklear both note that during dinner time, it is possible that doors from different cell blocks are opened at the same time to allow inmates to either go to, or return from, dinner. (Bullard Decl. ¶ 12; Locklear Decl. ¶ 10.) The record does not reflect that Officer Talton faced any negative disciplinary action as a result of her actions on that day. (*See* Incident Report, Williams Decl. at 64-76.)

After the May 25, 2019 incident, prisoner medical staff attempted to evaluate Plaintiff, but he initially refused. (*See* Ex. G to Williams Decl., Docket Entry 45-1 at 48-49.) Nonetheless, the medical provider noted Plaintiff as having a "[s]mall puncture from taser to [right] shoulder," a "superficial scratch to upper mid[-]back," and "2 scratches to [his] head." (*Id.* at 48.) Plaintiff stated that he was "good" and "ambulated under his own power from medical." (*Id.*) Plaintiff was seen later that same day for treatment for his injuries and to have his "wounds covered up." (*Id.* at 45-47.) The next day on May 26, 2019, Plaintiff was seen again because the steri-strips previously applied to his right shoulder had come off and his wound had "reopened." (*Id.* at 43.) It was "cleaned with betadine and secured with new steri-strip[s] and covered with [a] bandage." (*Id.*) There were no signs of an infection and Plaintiff was given extra bandages to continue to cover his wound. (*Id.*) Plaintiff was next scheduled for a medical assessment on May 29, 2019, but refused treatment for the injuries sustained during the May 25, 2019 altercation. (*Id.* at 41-42.)

Plaintiff was then seen by medical staff on June 26, 2019, which was for Plaintiff's "Restrictive Housing Screening." (*Id.* at 39-40.) Plaintiff had "no current complaints" and did

not appear to be in any distress at that time. (*Id.* at 39.) In addition, Plaintiff made a complaint about his teeth in September 2019, stating that he "[h]ad a filling on [his] front left tooth chipped when [he] was young," and that the "filling came out today and [his] nerve [was] exposed." (*Id.* at 50.) He expressed that he needed his teeth filled, and that his "chip[ped] tooth need[ed] urgent attention." (*Id.*) Plaintiff was routinely seen by mental health professionals after the incident, who all found that there were "[n]o significant mental health issues." (*Id.* at 57-63.)

Plaintiff filed a grievance after the May 25, 2019 altercation. (2019 Grievance, Ex. C to Williams Decl., Docket Entry 45-1 at 10-11.) Similar to the allegations in the Complaint, Plaintiff states that Officer Talton allowed another inmate into his housing unit and all prison officials failed to protect him as they knew Plaintiff was in danger. (*Id.*) The grievance proceeded through step three with a final finding that "[t]he staff actions were in accordance to [NC]DPS policy." (*Id.* at 9.)

## II. DISCUSSION

Summary judgment is appropriate when there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Zahodnick v. Int'l Bus. Machs. Corp.*, 135 F.3d 911, 913 (4th Cir. 1997). The party seeking summary judgment bears the initial burden of coming forward and demonstrating the absence of a genuine issue of material fact. *Temkin v. Frederick Cnty. Comm'rs*, 945 F.2d 716, 718 (4th Cir. 1991) (citing *Celotex v. Catrett*, 477 U.S. 317, 322 (1986)). Once the moving party has met its burden, the non-moving party must then affirmatively demonstrate that there is a genuine issue of material fact which requires trial. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*,

7

475 U.S. 574, 587 (1986). There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a fact finder to return a verdict for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Sylvia Dev. Corp. v. Calvert Cnty., Md.*, 48 F.3d 810, 817 (4th Cir. 1995). Thus, the moving party can bear his burden either by presenting affirmative evidence or by demonstrating that the non-moving party's evidence is insufficient to establish his claim. *Celotex*, 477 U.S. at 331 (Brennan, J., dissenting).

When making the summary judgment determination, the Court must view the evidence, and all justifiable inferences from the evidence, in the light most favorable to the non-moving party. *Zahodnick*, 135 F.3d at 913; *Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 196 (4th Cir. 1997). However, the party opposing summary judgment may not rest on mere allegations or denials, and the court need not consider "unsupported assertions" or "self-serving opinions without objective corroboration." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996); *see also Anderson*, 477 U.S. at 248-49.

### A. Plaintiff's Eighth Amendment Failure to Protect Claim.

Defendants first contend that they were not deliberately indifferent to Plaintiff's safety. (Docket Entry 45 at 12-20.) The undersigned agrees. In *Farmer v. Brennan*, 511 U.S. 825 (1994), the Supreme Court held that the Eighth Amendment to the Constitution "imposes duties on [prison] officials, who must provide humane conditions of confinement; prison officials . . . must take reasonable measures to guarantee the safety of the inmates[.]" *Id.* at 832 (internal quotation and citation omitted). As such, "prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners," *id.* at 833 (internal citations and quotations omitted), and are thus "not free to let the state of nature take its course," *id.* However, not

8

Case 1:20-cv-00042-LCB-JLW   Document 53   Filed 01/11/23   Page 8 of 17

"every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety." *Id.* at 834. "The burden is on the prisoner to demonstrate that prison officials violated the Eighth Amendment, and that burden is a heavy one." *Strickland v. Halsey*, 638 F. App'x 179, 184 (4th Cir. 2015) (internal citations and quotations omitted).

To establish a successful Eighth Amendment failure to protect claim, a prisoner must show (1) "a serious deprivation of his rights in the form of a serious or significant physical or emotional injury"; and (2) that prison officials were deliberately indifferent to the prisoner's health or safety. *Danser v. Stansberry*, 772 F.3d 340, 346-47 (4th Cir. 2014) (internal quotations and citation omitted); *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015) (citing *Farmer*, 511 U.S. at 834-35). With regard to deliberate indifference, the Fourth Circuit explained:

> In the Eighth Amendment context, deliberate indifference lies somewhere between negligence and purpose or knowledge: namely, recklessness of the subjective type used in criminal law. For a prison official to be liable, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. The test is subjective, not objective. A prison official is not liable if he or she knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent.

*Strickland*, 638 F. App'x at 184-85 (internal quotations and citations omitted). Proof of a prison official's subjective actual knowledge can be established through "circumstantial evidence showing, for example, that the substantial risk of inmate attacks was longstanding . . . and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it." *Makdessi*, 789 F.3d at 133 (internal

9

quotations and citation omitted). Ultimately, "[p]rison officials may not simply bury their heads in the sand and thereby skirt liability." *Id.*

Here, viewing the evidence in the light most favorable to Plaintiff, there is no genuine issue of material fact as to whether Defendants acted with deliberate indifference in violation of Plaintiff's Eighth Amendment rights.[4] First, while Plaintiff grieved of his safety concerns at Scotland in 2018, such grievance was general in nature and Plaintiff failed to provide specific names of the individuals whom he feared so that a proper investigation could be completed. (*See* 2018 Grievance, Williams Decl. at 14-22; *see also Bogan v. Brunsman*, No. 1:11-CV-259, 2013 WL 360357, at *6 (S.D. Ohio Jan. 30, 2013) (unpublished) ("[I]dentification of a prisoner's enemies is critical to the prison's ability to protect a prisoner because it is the prison officials, not the prisoner, who must determine whether there is a substantial risk of harm that warrants a transfer or other action."), *report and recommendation adopted*, No. 1:11CV259, 2013 WL 754262 (S.D. Ohio Feb. 27, 2013) (unpublished).) Defendants Bullard and Locklear's awareness of Plaintiff's general concerns about a risk to his safety is insufficient to establish that they had the subjective knowledge of a "substantial risk" to Plaintiff's safety. *Oxendine-Bay v. Mitchell*, 2016 WL 4546447 at *6 (W.D.N.C. Aug. 31, 2016) ("An inmate's generalized complaints to prison guards about alleged tensions among inmates at a prison and complaints about a general threat to the prisoner's safety does not establish deliberate indifference by prison guards where

---

[4] As a sub-argument, Defendants also contend that Plaintiff has failed to show a sufficiently serious injury. (Docket Entry 45 at 12-15.) Plaintiff opposes this argument stating, among other things, that he had stab wounds to his right shoulder. (*See* Docket Entries 49, 49-1.) Even assuming Plaintiff has demonstrated a sufficiently serious injury, the undersigned finds other grounds which warrant granting summary judgment in favor of Defendants as set forth herein.

10

an attack subsequently occurs."). Also, Defendant Poole was not even personally aware of any of Plaintiff's safety concerns as she was not part of Plaintiff's 2018 grievance process, nor did Plaintiff make her aware of specific threats to his safety. (*See* Poole Decl. ¶¶ 3-4.) Further, during that time, Plaintiff specifically stated that he was not seeking protective custody. (*See* 2018 Grievance, Williams Decl. at 19.) Thus, the record as a whole demonstrates that Defendants did not have the requisite knowledge of a substantial risk to Plaintiff's safety.

Moreover, Defendants Poole, Bullard, and Locklear state that they did not personally receive phone calls from Plaintiff's family members reiterating threats to his safety. (*See* Poole Decl. ¶ 4; Locklear Decl. ¶ 6; Bullard Decl. ¶ 6.) Plaintiff did submit two declarations from family members, one of which states that records can be provided showing that phone calls were made to Defendants. (*See* Declaration of Vicky Bolton, Docket Entry 49-2 at 3; *see also* Declaration of Vickie McLellan, Docket Entry 49-2 at 2.) However, even if such phone calls were made, the affidavits fail to assert a specific security threat, which further supports Defendant's argument that they were unaware of a substantial risk to Plaintiff's safety. (*See e.g.,* Bolton Decl. at 3 (phone calls made seeking transfer because Plaintiff "didn't feel safe at Scotland").)

Furthermore, beyond its failure to identify specific individuals, the 2018 Grievance addressed a fear separate from the May 25, 2019 incident—which occurred approximately five months after the grievance was filed. Plaintiff's 2018 Grievance generally stated that he feared for his safety because there were inmates and/or staff who were somehow related to the victim of his criminal matter. (*See* 2018 Grievance, Williams Decl. at 15.) However, the Incident Report states that the May 25, 2019 fight between Plaintiff and the other inmates was due to

11

gang members attempting to collect a debt. (Incident Report, Williams Decl. at 68-69.) This further demonstrates that the 2018 Grievance was not evidence that Defendants had the requisite knowledge of a substantial risk to Plaintiff's safety.

Ultimately, Plaintiff's vague 2018 Grievance alleging general safety concerns, without any specific information and without a request for protective custody, is insufficient to demonstrate that Defendants had the requisite knowledge of a substantial risk to Plaintiff's safety, particularly the May 25, 2019 incident that occurred approximately some five months later. Under the circumstances, "[a]llowing a plaintiff to prevail in a Section 1983 action, based merely on general concerns about non-specific threats to his safety, where the prisoner is subsequently attacked, would result in the strict liability of prison officers." *Oxendine-Bey*, 2016 WL 4546447, at *6 (collecting cases). Summary judgment should therefore be granted in Defendants' favor.

Even if Defendants actually knew of a substantial risk to Plaintiff's safety in light of Plaintiff's 2018 grievance process, Defendants acted reasonably in response to Plaintiff's safety concerns, and therefore were not deliberately indifferent by failing to protect Plaintiff. A prison official "who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted" because "[a] prison official's duty under the Eighth Amendment is to ensure reasonable safety." *Farmer*, 511 U.S. at 844 (internal citations and quotation omitted). Here, since Plaintiff's safety concerns were general in nature, Defendants did act reasonably in response to the information Plaintiff provided to them, including requesting that he provide more specific information. (*See* 2018 Grievance, Williams Decl. at 21.) In addition, Plaintiff

12

was "encouraged to follow up on this issue as needed." (*Id.* at 14.) The record does not demonstrate that Plaintiff provided Defendants with any specific names of individuals whom he feared. Furthermore, Defendants Bullard and Locklear were not present for the May 25, 2019 altercation between Plaintiff and the other inmates. (Bullard Decl. ¶ 9; Locklear Decl. ¶ 9.)[5] Prison officials present responded immediately to the altercation, including notifying local law enforcement of the incident. (Incident Report, Williams Decl. at 64-68, 73.) In sum, Defendants responded reasonably to Plaintiff's safety concerns and were not deliberately indifferent in failing to protect Plaintiff.[6]

## B. Qualified Immunity

Defendants Bullard, Locklear, and Poole also assert that they are entitled to qualified immunity. (Docket Entry 45 at 20-22.) Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*,

---

[5] To the extent Plaintiff attempts to hold Defendants Poole, Bullard and Locklear liable in their supervisory capacities, such claims also fail because Plaintiff has not demonstrated that Defendants "had actual or constructive knowledge that his subordinate was engaged in conduct that posed 'a pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff[.]" *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (setting forth requirements for supervisory liability under § 1983). Indeed, Plaintiff "assumes a heavy burden of proof in supervisory liability cases" because "[o]rdinarily, he cannot satisfy his burden of proof by pointing to a single incident or isolated incidents" such as the May 25, 2019 altercation alone. *Slakan v. Porter*, 737 F.2d 368, 373 (4th Cir. 1984). *See also Hubbard v. Byars*, No. CIV.A. 8:14-33-BHH, 2015 WL 337642, at *12 (D.S.C. Jan. 26, 2015) ("Plaintiff's claim is based on a single, isolated incident[;] . . . [T]here is no evidence in the record of widespread abuses, which would establish that [defendant supervisors] had knowledge of subordinates' conduct that violated Plaintiff's constitutional rights."), *aff'd*, 606 F. App'x 114 (4th Cir. 2015).

[6] Along with Plaintiff's response brief and declaration, he also filed a sur-reply. (*See* Docket Entries 49, 50, 52.) These documents do not create a genuine issue of material fact as to whether Defendants were deliberately indifferent to Plaintiff's safety.

13

457 U.S. 800, 818 (1982); *see also Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 306 (4th Cir. 2006) ("Qualified immunity shields government officials performing discretionary functions from personal-capacity liability for civil damages under § 1983[.]"). Thus, the traditional two-step qualified immunity inquiry requires a court to determine: "(1) whether the official violated a constitutional right; and if so, (2) whether the right was 'clearly established' at the time of its violation." *Rock for Life-UMBC v. Hrabowski*, 411 Fed. App'x 541, 547 (4th Cir. 2010) (citation omitted).

Here, Plaintiff has not demonstrated a violation of a constitutional right. Instead, the undisputed evidence illustrates that Defendants were not deliberately indifferent to Plaintiff's safety by failing to protect him. Therefore, this Court concludes that Defendants are entitled to qualified immunity. *See Abney v. Coe,* 493 F.3d 412, 415 (4th Cir. 2007) (finding that "[i]f [an official] did not violate any right, he is hardly in need of any immunity and the analysis ends right then and there").

### C. Officer Talton

Beyond granting Defendants' Bullard, Locklear, and Poole's Motion for Summary Judgment, Officer Talton, the only remaining Defendant, should also be dismissed from this action. As to the original summonses provided by Plaintiff, the Court quashed service of process as to all Defendants, including Officer Talton, after a motion to dismiss was filed. (*See* Docket Entries 13, 18, 21.) The U.S. Marshal was then unsuccessful in effectuating service upon Officer Talton at the last known address pursuant to the Court's prior Order. (*See* Text Order dated 5/5/2021; Docket Entries 25, 27.) As stated above, the Complaint alleges that Officer Talton, like the other Defendants, was aware of Plaintiff's safety concerns prior to the

May 25, 2019 incident, and she was specifically present on the day of the attack, opening the housing door in Plaintiff's unit and allowing Mr. Little to come into Plaintiff's housing area with a weapon. (Compl. at 5.)

Based upon the evidence submitted by Defendants Bullard, Locklear, and Poole, summary judgment should also be granted in favor of Officer Talton, "as the undisputed evidence shows that no one at the prison violated Plaintiff's constitutional rights." *Parham v. Parsons*, No. 3:11-CV-264-RJC, 2014 WL 3731424, at *9 (W.D.N.C. July 28, 2014)(citation omitted); *see also Columbia Steel Fabricators, Inc. v. Ahlstrom Recovery*, 44 F.3d 800, 802 (9th Cir. 1995) (explaining that "[the Ninth Circuit] ha[s] upheld dismissal with prejudice in favor of a party which had not yet appeared, on the basis of facts presented by other defendants which had appeared" where a plaintiff had a full and fair opportunity to present his or her claims.); *Moore v. Thomas*, 653 F. Supp. 2d 984, 1003 (N.D. Cal. 2009) ("Summary judgment may be properly entered in favor of unserved defendants where (1) the controlling issues would be the same as to the unserved defendants, (2) those issues have been briefed, and (3) Plaintiff has been provided an opportunity to address the controlling issues."); *Turner v. Warden, GDCP*, 650 F. App'x 695, 703 (11th Cir. 2016) (The "analysis of the merits of Plaintiff's constitutional claims applies equally to the unserved defendants.").

First, as stated above, Plaintiff's vague 2018 Grievance alleging general safety concerns did not demonstrate that any of the defendants had the requisite knowledge of a substantial risk to Plaintiff's safety. Indeed, the record does not reflect, nor is it obvious, that Officer Talton was aware of any danger that Mr. Little posed to Plaintiff. In addition, Officer Talton acted reasonably in response to the May 25, 2019 altercation. Rather than fail to intervene,

15

Officer Talton immediately sought help upon observing an inmate with a weapon. (Witness Statements, Williams Decl. at 77; *cf. Odom v. S.C. Dep't of Corr.*, 349 F.3d 765, 773 (4th Cir. 2003) ("[A] correctional officer who stands by as a passive observer and *takes no action whatsoever* to intervene during an assault violates the rights of the victim inmate.) (emphasis in original).) While Plaintiff alleges that an unauthorized inmate was allowed in his dorm area (Compl. at 5) and argues that it is a violation of prison policy for booth officers to allow such (*see* Docket Entry 49 at 1; Docket Entry 49-3), a violation of prison policy and procedure alone is insufficient to establish a § 1983 claim. *See generally Jackson v. Sampson*, 536 F. App'x 356, 357 (4th Cir. 2013) (holding that "prison officials' failure to follow internal prison policies are not actionable under § 1983 unless the alleged breach of policy rises to the level of constitutional violation"). In any event, the record reflects that the incident occurred during a time when there is a possibility that doors from different cell blocks are open at the same time to allow inmates to go to, or return from, dinner. (*See* Locklear Decl. ¶ 10; Bullard Decl. ¶ 12; Narrative Report, Williams Decl. at 83.) Officer Talton's actions as the control booth operator, at best, may have been negligent which does not present a constitutional violation. *See Hubbard*, 2015 WL 337642, at *11 ("[M]erely negligent behavior on the part of a prison official in failing to protect a prisoner from a risk of harm does not present a constitutional violation.").

Further, it is undisputed that inmates were involved in the fight other than Mr. Little whom Plaintiff states was unauthorized to be in the area. (*See* Compl. at 5 (Plaintiff stating that Mr. Little and two other inmates assaulted him); Incident Report, Williams Decl. at 64-66 (summaries of Sgt. Willie Davis and Sgt. Michael McDougald).) The Incident Report also

reflects that the homemade weapon was possessed by inmates other than Mr. Little. (*Id.* (summaries of Lt. Rodney Mungo, Sgt. Wilbert Walker, Sgt. McDougald, and Officer Willie Yates).) Ultimately, Officer Talton acted reasonably in response to the May 25, 2019 altercation, and there is no genuine issue of material fact as to whether she was deliberately indifferent to Plaintiff's safety. Summary judgment is therefore proper as to unserved Officer Talton.

### III. CONCLUSION

For the reasons sated herein, **IT IS HEREBY RECOMMENDED** that Defendants' Motion for Summary Judgment (Docket Entry 44) be **GRANTED**, and this action be dismissed with prejudice as to all Defendants.

Joe L. Webster
United States Magistrate Judge

January 11, 2023
Durham, North Carolina